v. Joshua Kagan and Michael Kagan. Joshua Kagan is on submission. All right. Mr. Kagan, you reserve one minute for rebuttal, and you can begin whenever you're ready. Good morning. May it please the Court. My name is Michael Kagan. I'm representing myself in this action. Just keep your voice up a little. Okay. There was no reasonable reliance, no contract, and the only thing clear and unambiguous about my e-mail communications was that I didn't have any money. What is also clear and unambiguous is that the district court committed multiple reversible errors. Its decision is not just flawed, it is fundamentally indefensible. It misapplies promissorial estoppel, contradicts itself, ignores binding precedent, and denies the nonmoving party a fair hearing. If allowed to stand, it would create a legal uncertainty, a world where casual, personal e-mails become enforceable contracts and where an ambiguous statement can somehow be both too unclear for a contract but clear enough to be considered a promise and for reliance. The district court acknowledged there was an, quote, open question of fact as to whether I assumed this debt, yet in the same ruling it found no factual dispute and granted summary judgment. That is self-contradictory. If a jury could conclude either way, then the issue belongs before a jury. Promissorial estoppel requires a clear and unambiguous promise and a reasonable reliance. My e-mails contained neither. They were conditional, forward-looking. They had no terms, amounts, dates, payment schedules, and made in the context of personal hardship, facts the court ignored. Worse, it imposed liability on the nonparty to the original loan, violating basic contract principles. Why did Sedell wait until now, until my father died, to bring this claim? Because he knew my father's testimony would destroy his case. That is prejudice. That is latches. That is injustice. The court has only one option. Reverse the district court's decision and dismiss this case. Anything else would be a betrayal of both law and fairness. The district court's reasoning on reliance is self-contradictory, illogical, and legally impossible. Sedell, a sophisticated businessman, claims he reasonably relied on my informal e-mails. Yet the record shows he never met me, never spoke to me outside these e-mails, and never asked for a signed guarantee. Let's be clear. Sedell knew exactly how to secure a debt. When he lent money to my father, Irving, he required a signed promissory note. When dealing with me, someone he had no prior relationship with, he did not. If he truly believed I was assuming this debt, why didn't he take the most basic step to protect himself? Because he never actually believed I assumed the debt. The district court's justification makes even less sense. Judge Knepper found that Sedell's reliance on me was reasonable, quote, considering Sedell's long friendship with Irving. But that logic defeats itself. If Sedell relied on Irving, someone he knew, he actually knew, that only proves he never relied on me. Sedell himself admits this. In his brief, he states he acted, quote, after Irving, in essence, vouched for Michael. And that, quote, after Irving's death, no longer having Irving as a backstop in place to ensure that the loan would actually be repaid, he brought this lawsuit. That is a direct admission that his reliance was on Irving, not on me. Promissorial estoppel requires reasonable reliance on a clear promise. We have neither here. Sedell never met me, never sought a contract with me, and never actually relied on me until years later when it was too late for the only person who could contradict his story to testify. An unpaid loan, a routine business risk, is not an unconscionable injury under promissorial estoppel. Courts reserve this doctrine for extraordinary justice such as fraud or severe hardship beyond normal business losses. Sedell, a sophisticated lender, knowingly assumed the risk of nonpayment just as all lenders do. Financial loss without more does not meet the high bar of unconscionable injury required to override the statute of frauds. If Sedell truly believed he had suffered an extraordinary justice, why did he choose not to testify regarding actual fraudulent complaints? That claim, if proven, could have provided the exception he needed to support promissorial estoppel and awarded him punitive damages in addition. But he refused to testify. That is not the action of someone seeking justice. That is the action of someone avoiding scrutiny.  Mr. Kagan, your time is up, and you have your one minute rebuttal, all right? Yes. Thank you. Thank you, Your Honor. All right. Mr. Zubitoff. May it please the Court, Alexander Zubitoff, on behalf of the Plaintiff Appellee Rafidzadeh. There are all the elements of a promissory estoppel claim that have been established here as both Magistrate Judge Netburn found in her report and recommendation and Judge Engelmeyer in adopting that report and recommendation. There, in contrast to what Mr. Kagan suggested, there are very concrete and specific promises by him throughout this record and many of them are summarized by Judge Engelmeyer at page A-104 of the appendix. But Mr. Kagan specifically says in his initial e-mail to Mr. Sada in December of 2017, in which Mr. Kagan asks Mr. Sada to delay in collecting on the loan, he says it is truly my obligation, not my father's, and the additional 90 days that he asks for at that point would allow me to generate the funds necessary to repay you. Now, if that is at all ambiguous, there then follows a stream of e-mails over the course of the ensuing years in which Mr. Kagan again and again makes very specific statements about, he's just waiting on the signature of the Dominican foreign minister to get this one deal done that's going to allow me to generate the funds to repay you. I'm going to have the funds in the next 10 days. It's all very, very specific stuff. It's not vague. It's not general. And, of course, there's a clear detriment here, as necessary for promissory estoppel claim reliance to Mr. Sada's detriment, in that he waited to collect. As a result of waiting to collect based on these promises of repayment, the primary lender, Mr. Kagan's father, died in January of 2020, and Mr. Sada lost his backstop, lost the individual who he personally knew and who had promised repayment and who had, according to Mr. Michael Kagan's e-mail in January 2020, who had made Mr. Michael Kagan promise on his deathbed to repay this loan, which, of course, never happened. Mr. Kagan also suggests that his father's testimony would somehow destroy this case. There is no basis for that whatsoever. He does not anywhere in his many pages of briefing explain what exactly his father would be testifying upon that would in any way affect his promissory estoppel claim. It's all e-mails between Mr. Sada and both Mr. Michael Kagan and his father, Mr. Irving Kagan, who are in different countries. They were not meeting in person. It's all e-mail communication, and the e-mail communication that is pertinent to these facts is the e-mail communication directly between Mr. Michael Kagan and Mr. Sada. So there's no issue as to which Mr. Kagan's father could conceivably have been a witness. Unless there are other issues that the Court would like me to address, we would rest on our briefs. All right. Thank you. All right, Mr. Kagan, you have one minute for rebuttal. The e-mail, the e-mail that he, that the other side is talking about, truly my obligation, that was a moral statement. My father asked me for my help to help him. And indeed, it's that very e-mail that Judge Ned Byrne says was ambiguous and needed to go to a jury. It could not be used. Did you have a question, Your Honor? No. Okay, sorry. So to throw that in to everything else as if that also is truly my obligation, that was unambiguous, is not credible. In addition to which, I made several of those statements and they were quoted where basically I'm saying I need some more time. I'm not sure when this is going to happen. And my father could have testified indeed as to whether these were, whether I had actually taken on this or he had asked me for my help. I only took on about $25,000. He only provided me about $25,000 worth of the $130,000 loan. So these were all issues that my father could have testified to. And on promissorial estoppel is whether there were some e-mails indeed where he said, in whatever event, it's me. I'm taking care of it. I'm paraphrasing. That would be my father speaking. So he could have testified very much to that effect. All right. Thank you, Mr. Kagan. Thank you. Thank you both for a reserved decision. Have a good day.